**WEST AFRICA NAVIGATION, LTD., OF MONROVIA, Libellant,**

v.

**ORE & FERRO CORPORATION, Respondent.**

United States District Court
S. D. New York.

Dec. 5, 1961.

See also D.C., 192 F.Supp. 651.

Tashof & Sobler, New York City, for libellant; Paul M. Klein, New York City, of counsel.

Manning, Hollinger & Shea, New York City, for respondent; Robert J. Ruben, New York City, of counsel.

SUGARMAN, District Judge.

By charter party dated March 28, 1958 at New York, libelant, West Africa Navigation, Ltd., of Monrovia, as owner of the African King, undertook to make available to respondent, Ore & Ferro Corporation, its vessel at a safe berth in Beira, Portuguese East Africa, for a voyage to Mobile, Alabama.

The voyage was completed. There is no dispute concerning any matter incident to the performance of this maritime contract other than the right of the respondent-charterer to certain moneys claimed and deducted from the freight moneys by it, for despatch. It is for this deduction that the owner-libelant sues.

The parties to this litigation agree that if the owner-libelant's construction is correct, respondent-charterer owes it $4,-541.66; if it is incorrect, the respondent-charterer owes nothing.

The cases relied on by the owner-libelant and the respondent-charterer for their respective positions do tend to give each party some support. However, no case cited is directly in point and each is distinguishable from the instant suit.

For example, the decision in George E. Warren Corporation v. Britain S.S. Co.,[1] which the owner-libelant stresses, turned on the "reversible" aspect of the charter, a feature not in the instant contract, as was pointed out by Judge MacMahon in denying summary judgment on the owner-libelant's motion.

Respondent-charterer's primary authorities are English cases. They, of course, are entitled to respect but are not controlling because the *lex loci contractus* here is the law of this country, not the law of England.[2]

Judge MacMahon, in denying the owner-libelant's pre-trial motion for summary judgment, held that a trial was required so that evidence might be adduced concerning the circumstances surrounding the execution of this ambiguous contract so that its true interpretation can be gleaned.[3]

The pertinent clauses of the charter party are as follows:

"4. The cargo is to be loaded at the rate of 800 tons of 2240 lbs. and to be discharged at the rate of 1000 tons of 2240 lbs. per clear working day of 24 consecutive hours (weather permitting). Sundays and stevedoring holidays always excepted. Owners are to have five (5) hatches available for cargo, otherwise the time allowed for loading and discharging shall be pro-rated accordingly. Time lost by reason of all or any of the following causes shall not be computed in the loading or discharging time, viz.: War, Rebellion, Tumults, Civil Commotions, Insurrections, Political Disturbances, Epidemics, Quarantine, Riots, Strikes, Lockouts, stoppage of Miners, Workmen, Lightermen, Tugboatmen, Stevedores, Longshoremen, or other hands essential to the Working, Carriage, Delivery, Shipment, Loading or Discharge of said cargo whether partial or general, or accidents at the Mines, at Receiver's Works or Wharf, Landslips, Floods, Frost or Snow, Bad Weather, Intervention of Sanitary, Customs, and/or other constituted Authorities; partial or total stoppage on Rivers, Canals or on Railways,

---

1. 100 F.2d 283 (1st Cir. 1938).

2. See George E. Warren Corporation v. Britain S.S. Co., 100 F.2d 283, 285 (1st Cir. 1938).

3. West Africa Navigation, Ltd. of Monrovia v. Ore & Ferro Corporation, 192 F.Supp. 651 (S.D.N.Y.1960).

or any other cause beyond control of Charterers.

"5. Time for loading to count from 8:00 a. m. after the ship is reported and ready, and in free pratique and in berth for loading, and for discharging from 8 a. m. after the ship is reported and in every respect ready, and in free pratique, whether in berth or not. Steamer to be reported during official hours only. In case shippers can arrange to load or discharge on Sundays or Holidays, or before time commences to count, Captain to allow work to be done; half such time used to count. Time between noon Saturday and 8:00 a. m. Monday at loading port, and between 5:00 p. m. Friday and 8 a. m. Monday at discharging port, not to count unless used; in which case half such time actually used to count.

\*   \*   \*   \*   \*   \*

"11. Demurrage (if any) is payable to the Owners at the rate of $1000.00 per running day or prorata for part thereof. Owners are to allow Charterers despatch money at the rate of $500.00 per day, or prorata for part thereof, for all time saved in loading and discharging. Charterers are to have the right to average the days allowed for loading and discharging."

The question is whether the phrase in clause 11 "all time saved in loading and discharging" includes days which are excluded in computing time within the reach of clauses 4 and 5.

▉ The rule seems to be that unless a contrary intent appears in the charter, despatch money is payable for each day saved even though it is a Sunday or other day excepted as a lay day because the shipowner has the benefit of having his ship at sea so much sooner.[4]

Any doubts which the court might have entertained concerning the correct construction of the agreement in suit are dispelled by the evidence adduced at the trial. Robert W. Tyd, a dry cargo chartering broker, testified as an expert in the customs of the trade. I accept his testimony against which no testimony was offered in contradiction that the meaning to be ascribed to the language here in dispute is the meaning given to those words by respondent-charterer, viz., all time saved means every day saved, not every lay day saved.

Accordingly, the libel is dismissed with costs.

Settle a decree.

---

4. Poor on Charter Parties (3d ed.), § 222.